UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| CLARK R. HUFFMAN; | : | |
| PATRICIA L. GRANTHAM; | : | |
| LINDA M. PACE; and | : | |
| BRANDI K. WINTERS, *individually and* | : | |
| *on behalf of a class of all others similarly situated*, | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | No. 2:10-cv-05135 |
| | : | |
| THE PRUDENTIAL INSURANCE COMPANY | : | |
| OF AMERICA, | : | |
| | : | |
| Defendant. | : | |

_____

## **MEMORANDUM OPINION**

**Plaintiffs' Motion for Class Certification, ECF No. 119 - Denied**

**Joseph F. Leeson, Jr.**                                                                               **September 30, 2016**
**United States District Judge**

### I.    Introduction

Plaintiffs are beneficiaries of employer-sponsored life insurance policies. Defendant Prudential Insurance Company of America is the insurer. Plaintiffs received all of the benefits they were entitled to under these policies, but they contend that the method of payment that Prudential chose did not comport with the terms of the policies. The policies stated that payment would normally be made "in one sum." Prudential paid them by giving them each a "Prudential Alliance Account" from which they could withdraw their funds using a Prudential-supplied "checkbook." In Plaintiffs' view, that was not payment "in one sum." Their primary complaint, however, is that Prudential invested the balances of their Accounts for itself until the time that they withdrew their funds. They filed this action on behalf of themselves and a putative class, claiming that Prudential flouted the language of the policies and breached its fiduciary duties under the Employee Retirement Income Security Act of 1974 (ERISA) and state law. Their goal is to compel Prudential to disgorge the profits it made by investing the funds in their Alliance Accounts.

Plaintiffs now move to certify a class of beneficiaries of Prudential-insured life insurance plans whom Prudential paid in this manner. Because they have not shown that common questions of law or fact would predominate over individual disputes, their motion is denied.

**II.     Background**

Plaintiffs Clark R. Huffman and Brandi K. Winter are beneficiaries of their mother's life insurance policy, which was provided for her by her employer, JPMorgan Chase & Co. *See* Am. Compl. ¶ 10, ECF No. 103. She died in 2008. *Id.* ¶ 13. Plaintiffs Patricia L. Grantham and Michael A. Pace are the beneficiaries of their spouses' life insurance policies, provided by their employer, Con-Way, Inc. *Id.* ¶ 11. Their spouses each died in 2010. *Id.* ¶¶ 14-15. Prudential was the insurer of these policies. According to terms of the policies that Prudential issued to JPMorgan and Con-Way, life insurance benefits are "normally paid to the Beneficiary in one sum." *See* Flitter Decl. Ex. 15, at 35, ECF No. 119 [hereinafter "Con-Way Booklet"]; Flitter Decl. Ex. 16, at 12, [hereinafter "JPMorgan Booklet"].[1] But, alternative methods of payment may be selected. During the plan participant's life, he or she may make other payment arrangements "by proper written request to Prudential." *Id.* If the plan participant did not designate a method of payment prior to death, "the Beneficiary and Prudential may then mutually agree" on an alternative payment method. *Id.*

If no alternative method of payment was arranged, Prudential's practice was to pay any claim that exceeded $5,000 through a device called a "Prudential Alliance Account." *See* Flitter Decl. Ex. 1, at 83:21-84:12. That is Prudential's name for what is known in the industry as a retained asset account. Prudential paid each of the four Plaintiffs through an Alliance Account, and it works as follows. Once Prudential has approved a claim for benefits, it sends the beneficiary an "Alliance Payment Notification," which explains that the claim is being paid through an Alliance Account. *See* Flitter Decl. Ex. 3, at 11. Prudential then sends the beneficiary a package of materials containing information about the Account, including the current rate of interest paid on the balance of the Account. *Id.* The package also contains an "Alliance checkbook" issued by a bank (which, from 2004 until 2014, was JPMorgan Chase & Co.), which is how the beneficiary is able to draw on the funds credited to the Account. *Id.*; Flitter Decl. Ex. 5, at 1-2; Flitter Decl. Ex. 31, at 2. There are no limits on the beneficiary's ability to use these checks[2] to withdraw funds, which means that the beneficiary may, if desired, withdraw the entire balance at once by writing a single check for the full amount. Flitter Decl. Ex. 8, at 6.

---

[1]     These provisions appear in a document called a "Booklet," which was provided to each participating employee for the purpose of "describ[ing] the Program of benefits [the employer] arranged for [the employee]." Con-Way Booklet 5; JPMorgan Booklet 1. The Booklet, together with a document called a "Certificate of Coverage" included in the Booklet, form the employee's "Group Insurance Certificate." Con-Way Booklet 7; JPMorgan Booklet 4. The Group Insurance Contracts between Prudential and the employers expressly incorporate the Group Insurance Certificates into the Contracts. *See* Rosenberg Decl. Ex. 26, at 6, ECF No. 123 [hereinafter "Con-Way Group Contract"]; Rosenberg Decl. Ex. 18, at 6 [hereinafter "JPMorgan Group Contract"]; *see also* Con-Way Booklet 7 ("This Booklet and the Certificate of Coverage together form your Group Insurance Certificate. The Coverages in this Booklet are Insured under a Group Contract issued by Prudential. All benefits are subject in every way to the entire Group Contract which includes the Group Insurance Certificate."); JPMorgan Booklet 4 (same). That means that the Booklets are part of the Group Contracts, which makes them plan documents for ERISA purposes. *See, e.g., Topalian v. Hartford Life Ins. Co.*, 945 F. Supp. 2d 294, 333 (E.D.N.Y. 2013) ("[T]he Booklet-certificate here is incorporated into and is a part of the plan and controls the benefit plan provisions.").

[2]     Technically, these are "drafts," not checks, but Prudential refers to them as the latter "because that is the term that customers are familiar with, and because the drafts operate for all intents and purposes as a check." *See* Flitter Decl. Ex. 8, at 8.

Winters did just that, while the other Plaintiffs drew on their funds over time. *See* Flitter Decl. Exs. 23-26.

"These accounts operate from the account holders' perspective just like a bank checking account," appearing as though there is an account in their name at JPMorgan where their funds are being held. *See* Flitter Decl. Ex. 8, at 8. In reality, Prudential holds onto the funds until the beneficiary writes a check against the Account. When that happens, Prudential transfers funds to JPMorgan to cover the withdrawal. *See id.* at 6. While the funds remain with Prudential, it invests them, netting the difference between the returns it is able to generate from those investments and the interest it pays to the beneficiary on the Account balance. *See id.* at 11-12.

There is no dispute that each of the four Plaintiffs received all of the benefits to which they were entitled under their decedents' benefit plans, but they take issue with the fact that Prudential chose to pay their benefits through these Alliance Accounts and invest their funds for its own benefit prior to withdrawal. The premise of their claims is that Prudential was subject to ERISA's fiduciary duties when it decided to pay their benefits through Alliance Accounts and invest the balances. *See* 29 U.S.C. § 1002(21)(A). ERISA imposes a number of duties upon fiduciaries, including an obligation to discharge its duties "in accordance with the documents and instruments governing the plan" and "for the exclusive purpose of . . . providing benefits to participants and their beneficiaries." *Id.* § 1104(a)(1)(A)(i), (D). Plaintiffs claim that by paying their benefits through Alliance Accounts when the plans called for payment "in one sum," Prudential failed to discharge its duties in accordance with the terms of the plans, and by investing their funds for itself, Prudential was not acting exclusively for the purpose of providing them with their benefits. *See* Am. Compl. ¶¶ 50-66. They also claim that Prudential violated 29 U.S.C. § 406(a)(1)(C), which prohibits an ERISA fiduciary from causing a plan to engage in a transaction that involves the provision of services between the plan and a party in interest. *See id.* ¶¶ 57-66. If it turns out that Prudential was not subject to ERISA's fiduciary duties, Plaintiffs have also claimed, in the alternative, that Prudential was subject to, and breached, fiduciary duties imposed by state law. *See id.* ¶¶ 67-73.

Plaintiffs now move to certify a class of beneficiaries of Prudential-insured life insurance plans who were paid through Prudential's Alliance Accounts. Their proposed class includes all individuals who satisfy the following two requirements: (1) at any time after September 29, 2004 and continuing to the present, they were beneficiaries under ERISA-governed employee welfare benefit plans that were insured by group life insurance policies issued by Prudential that contained the payment language, "Life Insurance is normally paid to the Beneficiary in one sum" and did not contain the language, "Subject to applicable law, where the amount of the benefit meets Prudential's current minimum requirement, payment in one sum will be made by establishing a retained asset account in the Beneficiary's name, unless the Beneficiary elects another settlement or payment option available at the time of claim, and the benefit distribution will be deemed complete when the account is established," and (2) Prudential "retained their death benefits." *See* Proposed Order Certifying Class ¶ 1, ECF No. 119.

### III. Legal standard – Certification of a class under Rule 23(b)(3)

Under Rule 23(a), there are four requirements that every putative class action must meet in order to be certified:

> (1) the class must be "so numerous that joinder of all members is impracticable" (numerosity); (2) there must be "questions of law or fact common to the class" (commonality); (3) "the claims or defenses of the representative parties" must be "typical of the claims or defenses of the class" (typicality); and (4) the named plaintiffs must "fairly and adequately protect the interests of the class" (adequacy of representation, or simply adequacy). Fed. R. Civ. P. 23(a)(1)-(4).

*In re Cmty. Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010). In addition to these four general requirements, there are additional requirements that must be met depending upon the type of class the moving party seeks to certify. There are three types of class actions that can be maintained, and Rule 23(b)(1)-(3) specifies the additional requirements that apply to each of them. Plaintiffs seek to certify their class under Rule 23(b)(3), which requires them to show, in addition to the four general requirements in Rule 23(a), "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

All of these requirements must be satisfied for the class to be certified, *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008), and the party moving to certify the class bears the burden of showing, by a preponderance of the evidence, that the proposed class meets each of them, *id.* at 307, 316 n.14 (citing *Unger v. Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir. 2005)). This means that "[a] party's assurance to the court that it intends or plans to meet the requirements is insufficient" to show that class treatment is warranted. *See id.* at 318 (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 191 (1974)). "[T]he decision to certify a class calls for findings by the court" that each of Rule 23's requirements has been satisfied, and to do so, "the court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits." *Id.* at 307. In sum, "a district court exercising proper discretion in deciding whether to certify a class will resolve factual disputes by a preponderance of the evidence and make findings that each Rule 23 requirement is met or is not met, having considered all relevant evidence and arguments presented by the parties." *Id.* at 320.

### IV. Plaintiffs have failed to show that their proposed class satisfies Rule 23.

Prudential does not dispute that the proposed class satisfies Rule 23(a)'s numerosity requirement. Plaintiffs estimate that under the definition of the class that they have proposed, there would be more than 100,000 class members, which is plainly sufficient. *See Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001) ("[G]enerally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."). But that is the extent of the common ground between them. As with many proposed Rule 23(b)(3) classes, their disagreements center on whether common questions of law or fact would

4

predominate over issues affecting only individual class members. Some of their arguments run over into the separate requirements of commonality, typicality, and adequacy, which is not surprising given that the "'commonality' requirement is subsumed under, or superseded by, the more stringent . . . 'predominance' inquiry," *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 609 (1997), and "[t]he adequacy-of-representation requirement 'tend[s] to merge' with the commonality and typicality criteria," *id*. at 626 n.20 (quoting *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 157 n.13 (1982)).

The predominance requirement asks whether "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting 2 William B. Rubenstein, *Newberg on Class Actions* § 4:50, at 196-97 (5th ed. 2012)). With that understanding in mind, the focus here is "on whether essential elements of the class's claims can be proven at trial with common, as opposed to individualized, evidence." *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 359 (3d Cir. 2013) (citing *In re Hydrogen Peroxide*, 552 F.3d at 311). It is evident that to make this determination, the court "must formulate some prediction as to how specific issues will play out," *see In re Hydrogen Peroxide*, 552 F.3d at 311 (quoting *In re New Motor Vehicles Can. Exp. Antitrust Litig.*, 522 F.3d 6, 20 (1st Cir. 2008)), which means that "[t]he predominance inquiry is especially dependent upon the merits of a plaintiff's claim," *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 780 (3d Cir. 2009). Ultimately, "[i]f proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, 795 F.3d 380, 399 (3d Cir. 2015) (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001)), *cert. denied sub nom. PNC Bank v. Brian W.*, 136 S. Ct. 1167 (2016).

An overview of the merits of Plaintiffs' claims will be helpful in understanding whether this proposed class meets the predominance requirement. The essence of their claims is that Prudential violated its fiduciary duties when it chose to pay their benefits through the Alliance Accounts and invest the balances of those Accounts for itself. That means that whether Prudential was acting as a fiduciary at the time is of critical importance. Under ERISA,

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

5

29 U.S.C. § 1002(21)(A).[3] As these provisions make clear, whether a person is a fiduciary under ERISA depends upon whether that person "has exercised discretionary authority or control over a plan's management, assets, or administration." *See Confer v. Custom Eng'g Co.*, 952 F.2d 34, 36 (3d Cir. 1991). Plaintiffs contend that Prudential's decision to pay their benefits through Alliance Accounts and invest those balances for itself involved an exercise of discretionary authority over the administration of the plans. *See* 29 U.S.C. § 1002(21)(A)(iii). They also argue that because ERISA deems the underlying insurance policies to be assets of the plans, Prudential was exercising authority or control over the management of plan assets when it made these decisions. *See id.* § 1002(21)(A)(i).

Plaintiffs' claims find their origins in the case of *Mogel v. UNUM Life Insurance Co. of America*, 547 F.3d 23 (1st Cir. 2008). There, three beneficiaries of employer-sponsored life insurance policies brought suit against the insurer, UNUM, after it chose to pay each of them through an "UNUM Security Account"—UNUM's version of a retained asset account. 547 F.3d at 25. The policies provided that, "[u]nless otherwise elected, payment for loss of life [would] be made in one lump sum," and the beneficiaries claimed that UNUM breached its ERISA-imposed fiduciary duties by paying each of them through the Security Accounts instead of in a "lump sum" and by investing the balance of those Accounts for itself until the funds were withdrawn. *Id.* UNUM took a different view. It argued that once it had reviewed the beneficiaries' claims and determined that they were eligible for payment, its role as an ERISA fiduciary came to an end, because all that was left was the "non-discretionary ministerial task of 'paying the benefits.'" *Id.* at 26. If that was so, then UNUM was not subject to any fiduciary duties when it decided to pay the benefits through the Security Accounts and invest the funds backing those accounts. *Id.* The First Circuit sided with the beneficiaries. The court found that the delivery of benefits through a Security Account "did not constitute a 'lump sum payment' called for by the policies," which meant that UNUM had not yet "completed its fiduciary functions under the plan when it set up the Security Accounts and mailed the checkbooks." *Id.* For UNUM, that meant that "until the beneficiaries had received the lump sum payments"—that is, until they had received "actual payment"—it "remained obligated to carry out its fiduciary duties." *Id.* Because UNUM was still under its fiduciary duties when it chose to pay the claims through the Security Accounts and invest the balances for itself, the beneficiaries had viable claims that UNUM had breached those duties. *Id.*

A few years later, the Second Circuit confronted a variation of these claims in *Faber v. Metropolitan Life Insurance Co.*, 648 F.3d 98 (2d Cir. 2011). That case largely unfolded in the same way: two beneficiaries of employer-sponsored life insurance policies claimed that the insurer—this time, MetLife—breached its ERISA-imposed fiduciary duties by disbursing their benefits through its version of a retained asset account, called a Total Control Account (TCA), and investing the balances for itself. 648 F.3d at 100. But there was an important difference: the plan documents expressly stated that benefits would be paid through a Total Control Account. *Id.*

---

[3] Subsection (ii) lists another circumstance, not relevant here, under which a person can be deemed to be an ERISA fiduciary.

6

at 100-01.[4] This difference proved to be dispositive. The court held that "MetLife discharged its fiduciary obligations as a claims administrator and ceased to be an ERISA fiduciary when, *in accordance with the Plans*, it created Plaintiffs' TCAs, credited them with the amount of benefits due, and issued checkbooks enabling Plaintiffs to withdraw their proceeds at any time." *Id.* at 104 (emphasis added). In other words, "once the TCAs were set up and credited, MetLife had provided all of the benefits promised by the Plans, in the manner contemplated by the Plans," which meant that it was no longer exercising any discretionary authority or responsibility over the plans and was no longer subject to ERISA's fiduciary duties. *Id.* at 105. That distinguished the case from *Mogel*, whose result was "predicated on the fact . . . that the insurer failed to abide by plan terms requiring it to distribute benefits in lump sums" and thus had not "completed its fiduciary functions under the plan when it set up the [retained asset accounts]." *Id.* at 107 (quoting *Mogel*, 547 F.3d at 26)).

Two years after *Faber*, the Third Circuit considered yet another variation of these claims in *Edmonson v. Lincoln National Life Insurance Co.*, 725 F.3d 406 (3d Cir. 2013). Again, a beneficiary of an employer-sponsored life insurance policy claimed that the insurer breached its fiduciary duties by choosing to pay her benefits through a retained asset account—this time, Lincoln National's "SecureLine Account"—and invest those benefits for itself until they were withdrawn. 725 F.3d at 411. Unlike *Mogel*, where the plan documents specified that payment would be made in a "lump sum," and unlike *Faber*, where the plan documents stated that payment would be made through a retained asset account, the plan documents in this case were silent on how the benefits would be paid. *Id.* at 420. Once again, the plan language (or absence thereof) proved to be dispositive. Initially, the plan's silence on the method of payment cut against Lincoln. Because the plan did not direct Lincoln how to pay benefits, it had the choice of how to make payment, which is "the definition of discretion" over plan administration.[5] *Id.* at 422. That meant that when Lincoln made the choice to pay the beneficiary's claim through a SecureLine Account, it was subject to ERISA's fiduciary duties. *Id.* But the court concluded Lincoln's choice of the SecureLine Account as the method of payment did not run afoul of those duties because "[t]he purpose of establishing the SecureLine Account was to pay [the beneficiary] benefits," and "[t]he retained asset account method of payment is not in itself necessarily consistent with ERISA." *See id.* at 423-24 (quoting *Vander Luitgaren v. Sun Life Assurance Co. of Can.*, 966 F. Supp. 2d 59, 71 (D. Mass. 2012)). Still remaining was the question of whether Lincoln's decision to invest the balance of the Account for itself was a breach of its fiduciary duties. On that point, the court drew a parallel to *Faber*. The court concluded that Lincoln "had completed its obligations with respect to managing or administering

---

[4] The two employer-sponsored plans that were involved contained slightly different language. One read, "Payment of a death benefit of $7,500 or more is made under MetLife's Total Control Account," while the other read, "If the benefit from a single claim is $6,000, or more, your beneficiary may receive basic life insurance under one of the several options available under the Beneficiary's Total Control Account (TCA) Program." *Faber*, 648 F.3d at 100-01.

[5] That also meant that Lincoln was "exercising authority or control over plan assets" because under ERISA, the underlying insurance policy, which Lincoln was administering, is itself deemed to be a plan asset. *See Edmonson*, 725 F.3d at 423 (citing 29 U.S.C. § 1101(b)(2)).

the plan once it established the SecureLine Account," which meant that "Lincoln was not managing or administering the plan"—and therefore not acting as a fiduciary—"when it invested the retained assets." *Id.* at 426. As in *Faber*, that meant that the First Circuit's decision in *Mogel* was inapposite, because unlike UNUM in that case, "Lincoln fulfilled its obligation to pay [the beneficiary] when it established the SecureLine Account." *Id.* at 425.

These cases make clear that whether Prudential was acting as a fiduciary when it decided to make payment through its Alliance Accounts and invest the balances of those Accounts for itself will depend in large part on whether making payment in that manner fulfilled Prudential's obligations to the beneficiaries under the plan documents.[6] In Prudential's view, that is a question that will predominately turn on individual issues, not common ones, and it has articulated a number of reasons why that is so. Two of these reasons are compelling, and they show that this proposed class does not meet the predominance requirement.

First, whether the terms of a particular plan permitted Prudential to settle a claim using an Alliance Account may vary from plan to plan, and the proposed class would include beneficiaries of approximately 2,200 plans.[7] Plaintiffs contend that their proposed class definition takes care of this problem because the class would include only beneficiaries of plans that contain the language, "Life Insurance is normally paid to the Beneficiary in one sum" and would specifically exclude the beneficiaries of any plans that provide that payment "will be made by establishing a retained asset account in the Beneficiary's name." In their view, all that would be necessary is for the parties to glance at one clause in each of the 2,200 plans to determine whether the language of that clause matches the language they have included in their proposed class definition. In other words, they view this as a simple matter of ascertainability, not predominance, because their proposed class would include only plans that all have the same operative language, which means that there would be no need to individually construe each plan.

The problem with this argument is that there may be other provisions in the plans other than that one clause that deal with payment, and that may give rise to disputes over how to properly reconcile the language of each plan. For example, the JPMorgan plan the parties have furnished contains a document, called a "Booklet," that states, "Life Insurance is normally paid to the Beneficiary in one sum"—the language that triggers Plaintiffs' proposed class definition. *See* JPMorgan Booklet 12. But another document, which refers to itself as the "summary plan description of the JPMorgan Chase Life and Accident Insurance Plans," states that, "[g]enerally, benefits will be paid to your beneficiary through Prudential's Alliance Account." *See* Rosenberg Decl. Ex. 30, at 1, 25. Plaintiffs argue that this summary is not part of the plan because it is not among the documents that are expressly incorporated into the Group Insurance Contract that

---

[6] Whether Prudential was subject to fiduciary duties under state law, as Plaintiffs have alleged in the alternative, turns on this same question. As both *Faber* and *Edmonson* recognized, if the creation of a retained asset account fully discharges an insurer's obligations under a plan, the only relationship that remains between the insurer and the beneficiary is "a straightforward creditor-debtor relationship." *See Edmonson*, 725 F.3d at 426 (quoting *Faber*, 648 F.3d at 104)).

[7] Prudential did not cite to any evidence showing how it arrived at this figure, but Plaintiffs do not dispute it. *See* Reply Supp. Pl.'s Mot. 16, ECF No. 127.

Prudential issued to JPMorgan. *See* JPMorgan Group Contract 6.[8] But Prudential points to another document, entitled "Health & Income Protection Program for JPMorgan Chase Bank and Certain Affiliated Companies," *see* Rosenberg Decl. Ex. 31, which acts as a sort of master plan (sometimes referred to as a "wrap-plan") for all of JPMorgan's various employee benefit plans. *See Admin. Comm. of Wal-Mart Stores, Inc. Assocs.' Health & Welfare Plan v. Gamboa*, 479 F.3d 538, 542 (8th Cir. 2007) (explaining that a wrap-plan "provides the governing structure of the overall [program] and describes the general procedures for determining participation, funding, administration, and claims under each individual welfare program to be established by the employer"); *see also Shaw v. Prudential Ins. Co. of Am.*, 566 F. App'x 536, 539 (8th Cir. 2014) (discussing the same JPMorgan "Health & Income Protection Program" document at issue here). This wrap-plan document expressly states that plan summaries are incorporated into the terms of the overall JPMorgan benefits program. *See* Rosenberg Decl. Ex. 31, at 2 (providing that each JPMorgan plan "shall be evidenced by [a summary plan description] describing its terms and conditions, which are hereby incorporated into the Program by reference"). Plaintiffs rejoin that even if it is true that the summary is incorporated into the JPMorgan plan documents, the summary states that "[i]f there is a discrepancy between the official plan documents and this summary, the official plan documents will govern." *See* Rosenberg Decl. Ex. 30, at 1.[9] In their view, this means that the provision in the Booklet that calls for payment "in one sum" would trump the provision in the summary that provides that payment will be made "through Prudential's Alliance Account." But that assumes that these two provisions actually conflict. Perhaps, the summary is simply explaining how payment "in one sum" will be accomplished: by crediting the full amount of their benefits to an Alliance Account, where the beneficiary can withdraw the entire amount at any time.

For present purposes, it is not necessary to resolve which side has the better reading of these plan documents. What this overview demonstrates is that there will be individual disputes

---

[8] According to the Group Contract,

> The entire Group Contract consists of: (1) the Group Insurance Certificate(s) listed in the Schedule of Plans, a copy of which is attached to the Group Contract; (2) all modifications and endorsements to such Group Insurance Certificates which are attached to and made a part of the Group Contract by amendment to the Group Contract; (3) the forms shown in the Table of Contents as of the Contract Date; (4) the Contract Holder's application, a copy of which is attached to the Group Contract; (5) any endorsements or amendments to the Group Contract; and (6) the individual applications, if any, of the persons insured.

JPMorgan Group Contract 6.

[9] They also argue that the Supreme Court's decision in *CIGNA Corp. v. Amara* bars a plan summary from affecting the terms of the plan. There, the Court concluded that "summary documents, important as they are, provide communication with beneficiaries *about* the plan, but . . . their statements do not themselves constitute the *terms* of the plan." 563 U.S. 421, 438 (2011). But "*Amara* did not concern a case of express incorporation" of a summary document into a plan document, which means that "*Amara* poses no automatic bar to a written instrument's express incorporation of terms contained in a summary plan description." *Tetreault v. Reliance Standard Life Ins. Co.*, 769 F.3d 49, 56 (1st Cir. 2014). And even if a plan summary has not been formally incorporated into the plan documents, the summary may nonetheless be relevant to their interpretation. For example, some courts have held that if language in a plan document is ambiguous, that language should "be given a meaning as close as possible to what is said in the plan summary." *See Koehler v. Aetna Health Inc.*, 683 F.3d 182, 189 (5th Cir. 2012).

over the proper construction and interpretation of the documents that make up the 2,200 plans that would be swept into the proposed class action—each with its own booklets, summaries, incorporation clauses, and directions for how to resolve conflicting terms that would need to be examined and construed. Thus, the Plaintiffs' own arguments about how the JPMorgan plan should properly be construed—arguments about whether the plan summary is incorporated into the terms of the plan, whether the terms of the summary conflict with the rest of the plan, and if so, how to reconcile them—belie the notion that the parties will only need to skim the text of one clause in each of the plans to see if it has the "in one sum" language.

      The second impediment to proceeding as a class is that, under the JPMorgan and Con-Way plans that the parties have presented, an individual beneficiary has the ability to select a method of payment of his or her choice. While the plans each provide that payment is "normally paid to the Beneficiary in one sum," they each go on to provide that "the Beneficiary and Prudential may . . . mutually agree" on an alternative method of payment. *See* JPMorgan Booklet 12; Con-Way Booklet 35. That means that even if Plaintiffs are correct that payment "in one sum" does not contemplate payment through an Alliance Account, an individual beneficiary could still choose to be paid through an Alliance Account, and Prudential would not have breached the plan by honoring that request. Whether Prudential "failed to abide by plan terms" when it paid a particular beneficiary through an Alliance Account thus depends upon whether that particular beneficiary may have chosen to be paid that way.[10]

      This presents a problem, because determining whether a particular beneficiary may have agreed to be paid through an Alliance Account does not appear to be a simple task. The plan terms do not require a beneficiary to follow a particular procedure to ask to be paid in a certain way. Rather, the plans simply provide that a "Beneficiary and Prudential may . . . mutually agree" on a particular method of payment.[11] The evidence the parties have presented reveals that this could occur in a variety of ways, some of which could be quite informal. Some of the claim forms that some of the beneficiaries may have used required them to select their method of payment by checking one of a number of boxes. *See, e.g.*, Rosenberg Ex. 27, at PRU-HUFF100011827. But other claim forms did not. And regardless of the type of form the beneficiary used, the beneficiary could also request a particular method of payment simply by

---

[10]     There are good reasons why a beneficiary may prefer to receive payment through an Alliance Account rather than by having Prudential send them a check. For those who does not have a checking account, having the ability to write checks against the Alliance Account may be an easier and quicker way for them to access their funds than having to make arrangements with a financial institution to cash a check. A beneficiary may also prefer the flexibility of being able to leave the funds in the interest-bearing Alliance Account while retaining the ability to withdraw any portion of those funds at any time, rather than being presented with a large lump sum check. Indeed, among the four named Plaintiffs, only one elected to withdraw all of her funds from the Account in a single check and close the Account. *See* Flitter Decl. Ex. 24. The other three used their Accounts like checking accounts (interest-bearing checking accounts, at that), each writing a number of checks to various payees. One of four Plaintiffs used her account to write thirty-five checks over a four-month period. *See* Flitter Decl. Exs. 23, 25-26.

[11]     This stands in contrast to the more formal process that a plan participant must follow to arrange for a particular method of payment during his or her lifetime. Under the JPMorgan and Con-Way plans, a plan participant wishing to direct Prudential to use a particular payment method must make a "proper written request to Prudential." *See* JPMorgan Booklet 12; Con-Way Booklet 35.

"writ[ing] *anywhere* on the claim form whatever mode of settlement they wanted." Rosenberg Decl. Ex. 3, at 114:18-115:3 (emphasis added); *see, e.g.*, Rosenberg Decl. Ex. 35, at PRU-HUFF000046299 (providing an example of a claim form where the beneficiary chose a method of payment by circling the words "lump sum" on one of the claim form's nine pages).

More troublesome is the fact that a beneficiary could also make payment arrangements by calling a Prudential representative. *See* Rosenberg Decl. Ex. 3, at 91:5-9; Flitter Decl. Ex. 8, at 4 (explaining that a beneficiary can choose a method of payment "by calling Prudential at the time of claim").[12] If, for example, a beneficiary called Prudential to inquire about how their benefits would be paid, and, after hearing the various payment options, the beneficiary agreed to be paid through an Alliance Account, that person would not have a claim that Prudential breached the plan terms by doing so. This raises the specter of having to review records of calls that individual beneficiaries placed to Prudential, if Prudential kept such records, or having to depose the individual beneficiaries to determine whether they may have discussed payment by Alliance Account with a Prudential representative. Inevitably, that would be followed by a dispute over whether the discussions the beneficiary had with Prudential constituted a "mutual[] agree[ment]" to payment by Alliance Account. This is no mere hypothetical. With respect to one of the four named Plaintiffs, Prudential relies on testimony from her deposition that reveals that she called Prudential at least twice to discuss her benefit payments and was informed about the Alliance Account payment method during those calls. *See* Rosenberg Decl. Ex. 6.

Determining whether a proposed class satisfies Rule 23's predominance requirement calls on the court to "formulate some prediction as to how specific issues will play out," *In re Hydrogen Peroxide*, 552 F.3d at 311, and it is not difficult to foresee that these class claims are likely to devolve into individualized fact finding over each beneficiary's interactions with Prudential, followed by individual adjudications of whether those interactions amounted to an "agreement" to payment through an Alliance Account. That is not suitable for class treatment. *See In re LifeUSA Holding Inc.*, 242 F.3d 136, 145-47 (3d Cir. 2001) (reversing the certification of a class of purchasers of annuity policies because their claims turned on their individual interactions with the insurer's sales agents); *Frahm v. Equitable Life Assurance Soc'y of U.S.*, 137 F.3d 955, 957 (7th Cir. 1998) (recognizing that class treatment was not appropriate for a group of ERISA beneficiaries whose claims "depend[ed] on what was said or sent to each [of them] personally" by the insurer's benefits advisers).

Plaintiffs' only response to this problem is to state flatly that whether Prudential breached its ERISA-imposed duties "do[es] not require any inquiry into [the] beneficiaries' actions."[13] But that is not so. Before Prudential could be found to have breached any of ERISA's fiduciary duties, it must be found to have been subject to them. As *Mogel*, *Faber*, and *Edmonson* make clear, that depends upon whether Prudential discharged its obligations under the terms of the plans by making payment through an Alliance Account. Because these plans expressly provide

---

[12] This can occur quite informally. *See* Flitter Decl. Ex. 1, at 96:10-18 (providing an example of a beneficiary who "call[s] in [to Prudential] saying I'm losing my house, I need the money tomorrow").

[13] *See* Reply Supp. Pls.' Mot. 7.

11

that an individual beneficiary and Prudential may agree upon a particular method of payment, whether any of the individual beneficiaries agreed to be paid through an Alliance Account is essential to determining whether Prudential complied with the plans.

## V.     Conclusion

Class certification is not appropriate "[i]f proof of the essential elements of the cause of action requires individual treatment," *In re Cmty. Bank*, 795 F.3d at 399 (quoting *Newton*, 259 F.3d at 172), and that is the case here. The Court finds that Plaintiffs have failed to show that their proposed class satisfies Rule 23(b)(3)'s predominance requirement, which is fatal to their motion for class certification.[14] An appropriate order follows.[15]

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge

---

[14] Because all of Rule 23's requirements must be met for a class to be certified, Plaintiffs' failure to establish the predominance requirement in Rule 23(b)(3) means that there is no need to consider whether their proposed class would have met the other requirements. *See Amchem*, 521 U.S. at 628 (declining to consider whether a proposed class would have met other Rule 23 criteria after concluding that the class failed to meet the predominance and adequacy requirements); *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 200 (3d Cir. 2009) (concluding, in the context of a proposed Rule 23(b)(2) class, that "there [was] no need to evaluate whether monetary relief predominates over . . . injunctive and declaratory relief" after concluding that the defendant "ha[d] not acted 'on grounds that appl[ied] generally to the class'").

[15] Plaintiffs also moved to exclude expert testimony that Prudential submitted in opposition to their motion for class certification. *See* ECF No. 126. Because that testimony did not factor into the Court's decision to deny class certification, this motion is denied as moot.